# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 13, 2010

## STATE OF TENNESSEE v. ANTHONY L. DAVIS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-D-3070    Cheryl A. Blackburn, Judge**

_____

**No. M2008-02119-CCA-R3-CD - Filed July 14, 2010**

_____

A Davidson County grand jury indicted the Defendant, Anthony L. Davis, and his co-defendant, Michael Ray Crockett, for the felony murder, premeditated murder, and especially aggravated robbery of victim Edgar Moreno-Gutierrez and for the especially aggravated robbery and two counts of felony murder of victim Michael Adams. The trial court severed the Defendant's trials, and in his first trial a Davidson County jury convicted him of the felony murder, premeditated murder, and especially aggravated robbery of victim Moreno-Gutierrez. The trial court merged the premeditated murder conviction with the felony murder conviction and sentenced the Defendant to life plus twenty-three years. In his second trial, a Davidson County jury convicted the Defendant of the especially aggravated robbery and two counts of the felony murder of victim Adams. The trial court merged the two felony murder convictions and sentenced the Defendant to life plus eighteen years, to be served consecutively to his sentence from his first trial. The two cases were consolidated on appeal. On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court improperly imposed consecutive sentencing in his first trial. After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, J.J., joined.

David A. Collins, Nashville, Tennessee, for the Appellant, Anthony L. Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; Bret Gunn and Rob McGuire, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## I. Facts

After the body of Edgar Moreno-Gutierrez was discovered in April 2006, investigators received information implicating the Defendant in Moreno-Gutierrez's death. During the course of their investigation of Moreno-Gutierrez's death, they discovered that the Defendant possessed items belonging to another homicide victim, Michael Adams, whose body was recovered in June 2008. Ultimately, the Defendant and his co-defendant, Michael Ray Crockett, were indicted for the robbery and murder of Moreno-Gutierrez, and the Defendant alone was indicted for the robbery and murder of Adams. Upon the Defendant's motion, the trial court severed the counts related to Moreno-Gutierrez's from those related to Adams, and it conducted two separate trials. This Court hereinafter will refer to the trial for the crimes against Moreno-Gutierrez as "Davis I" and to the trial for the crimes against Adams as "Davis II."

## A. Davis I

In August 2007, the Defendant was tried for the robbery and murder of Moreno-Gutierrez. At this trial, the following evidence was presented: Sylvia Fregoso, victim Moreno-Gutierrez's cousin, testified that Moreno-Gutierrez's mother was deceased and most of Moreno-Gutierrez's family resided in Los Angeles, California, at the time of his death. Fregoso recalled that Moreno-Gutierrez had been living in Nashville for only ten days when he was killed, and he did not use illegal drugs.

Raphael Fernandez, a Metro Nashville police officer, testified he worked in a Nashville Police Department Hispanic outreach program performing community outreach within the Hispanic community. Homicide detectives enlisted Officer Fernandez to assist them in identifying Moreno-Gutierrez's body, which was unidentified at the time. Armed with a photograph of the victim, he traveled to nearby businesses and apartment complexes, searching for someone who recognized the person in the photograph. The officer finally met a man who knew the victim and was in possession of the victim's laptop computer. Officer Fernandez opened the laptop, and he found pictures of the victim and his car on the laptop. In the course of his investigation, Officer Fernandez received information that on April 26, 2006, the victim met with a person who had called and asked to meet the victim. The officer reported this information to the homicide detectives.

Betty Carmona, another of the victim's cousins, testified that the victim used a cellular phone registered under her name while he was living in Nashville. Reviewing several pages of documentation of ingoing and outgoing cell phone calls, Carmona confirmed that the

2

documentation corresponded to the victim's cell phone registered under her name. The State introduced this documentation as an exhibit. Carmona further testified that the victim did not use illegal drugs.

Jeff Mitchell, a police officer with the Metro Nashville Police Department, testified he was a patrol officer in the North Precinct in April 2006. Officer Mitchell received a call reporting that a man's body was lying on the ground at the end of Old Amqui Road, a dead end road. As he approached this area in his patrol car, he saw a house that appeared be abandoned and a man lying face down in a gravel driveway beside the house. The man appeared to have a gunshot wound to the head, and he wore only a t-shirt and boxer shorts. A pool of blood, which had already begun to dry, surrounded the man's head, and the man was unresponsive, but the officer summoned an ambulance. The officer then requested crime scene investigators, and he blocked off Old Amqui Road with his cruiser until other officers arrived. Other than to help continue to secure the scene, Officer Mitchell participated no further in the investigation of the man's death.

Investigator Ed Hendricks, a fire fighter, EMT, and fire investigator with the City of Goodlettsville Fire Department, testified he was summoned to respond to a vehicle fire at 440 Professional Park Drive in Goodlettsville on April 24, 2006. When he arrived at the scene, the fire was already extinguished. He saw a plastic gas can beside the vehicle's driver's side door that was melted to the ground, and he noticed that the wheels and tires of the vehicle did not match the vehicle. He also noticed that each wheel was missing lug nuts, some wheels having only one or two lug nuts. The investigator concluded that, because the vehicle had been burned in a remote location and because a gas can was nearby, someone had intentionally burned the vehicle. He also testified that the absence of proper lug nuts indicated to him that the vehicle had not been driven very far since its tires were replaced. Referencing the report he prepared about the vehicle fire, he testified that the vehicle's vehicle identification number ("VIN") was 1G3GR11Y9HP303280.

On cross-examination, Investigator Hendricks explained that Long Hollow Pike ran off of Conference Drive, which intersected Professional Park Drive. He said that, because Long Hollow Pike did not go through Madison, someone driving on Long Hollow Pike toward Professional Park Drive would not necessarily be coming from Madison.

The State entered a certificate of title indicating that a vehicle with a VIN of 1G3GR11Y9HP303280 was registered to the victim, Edgar Morena-Gutierrez.

Tim Matthews, a Metro Police Department Crime Scene Unit officer, testified he responded to Old Amqui Road on the day the victim's body was found. Officer Matthews, along with another officer in his unit, Janess Graham, photographed the scene, drew a

diagram of the scene, and searched the area for evidence around the house and driveway. The diagram reflected that one .380 automatic Winchester bullet cartridge lay thirteen feet, nine inches from the victim's body, another such cartridge lay eight feet, seven inches from the victim's body, and yet another lay fourteen inches from the victim's head.

Michael Crockett, the Defendant's twenty-three year old co-defendant, testified he had been in jail since October 2006. Crockett testified he was present on April 23, 2006, when the Defendant killed the victim. At the time of the killing, Crockett, who had known the Defendant for four or five years, knew the Defendant as "T.J.," though he was aware of the Defendant's real name.

Crockett recalled that on the afternoon of April 23, 2006, he was playing basketball at a public park in Madison, Tennessee. While he was standing on the sidelines of the court, he heard someone call his name. He saw a person walking on the sidewalk who was flagging him down. Crockett started to walk toward the person, whom he soon recognized as the Defendant.

Crockett and the Defendant had a casual conversation, during which the Defendant showed Crockett cash with which he was going to buy an Oldsmobile Cutlass with custom rims and a sound system. The Defendant said that he was meeting the person selling the car at the park but that he had to get the rest of the purchase price from a man named Genesis Hester, whom the Defendant claimed was his father. Crockett testified that the person selling the Cutlass, a Hispanic man about six feet tall, arrived at the park approximately five to ten minutes after he and the Defendant began speaking. He arrived alone, driving the Cutlass the Defendant intended to buy. Crockett saw that the Cutlass did indeed have expensive rims.

The seller agreed to allow the Defendant to test drive the car. Crockett asked to go along, and he agreed to this, too. The seller assumed the backseat, Crockett assumed the front passenger seat, and the Defendant drove. The Defendant then told the seller he had to go to his father's house to get the rest of the purchase money for the car. The Defendant stopped the vehicle so that Crockett and the seller could swap seats.

The Defendant drove the car toward Hester's house on Old Amqui Road, but, when he came to the house, he kept driving instead of turning into the driveway, saying "let me go down here and turn around real quick." He drove to where Old Amqui Road dead ends, pulled into a driveway, and parked the car, though he acted as though he was about to back up. He asked the man to look behind the car to make sure he did not hit anything when he backed up, and when the man turned around, the Defendant pulled out a gun and pointed it at the man. Crockett said he did not know before this that the Defendant was armed. The

4

Defendant told the man to get out of the car, and he slowly complied. The Defendant got out of the car, keeping his gun trained on the man, while Crockett remained in the backseat.

Outside the car, the Defendant instructed the seller to empty his pockets, and he complied. The Defendant took the contents of the seller's pockets and put them in the car. He then told the seller to remove his shoes and clothing. The seller again complied, and the Defendant put these items in the car. The Defendant told the man to lie down, and instructed Crockett to assume the driver's seat. Each complied. Then, while standing in front of the car to the right, the Defendant shot the man. Crockett did not see the man as he was being shot. After the Defendant stopped shooting, he got back into the car and told Crockett to drive him to Hester's house. Crockett began to drive the car toward Hester's house, and the Defendant played with the car's hydraulic system for four to five seconds. Crockett recalled that the car's sound system had a television screen and a CD player. Although he did not see any speakers, Crockett believed the car must have been equipped with speakers.

As they pulled up to Hester's house, Hester was standing at the end of his driveway. Crockett stopped the car, and the three stared at each other in silence for four or five seconds. The Defendant, still in the car with Crockett, told Crockett to drive away. Crockett drove down Old Amqui Road, turned left at the first street he came to, then stopped the car at a stop sign. The Defendant rolled the victim's shoes and pants inside the victim's shirt, got out of the car, crouched down, and set the clothing on fire with a lighter. The Defendant got back into the car and directed Crockett to Old Hickory Boulevard. When they arrived at the intersection of Old Hickory Boulevard and Dickerson Road, Crockett turned left onto Dickerson Road, saying he was going to drive them to a store where a friend, who he said would help them "strip" the car, was working at the time. At trial, Crockett explained that this was a lie that he told the Defendant so that he could "get out of the situation." Crockett pulled up to a store beside a Walgreen's, got out of the car, and walked away.

Crockett acknowledged that he did not alert police to the killing after he left the Defendant because he feared for his family's safety. He also acknowledged that, after this shooting, he was arrested for possessing crack cocaine, drug scales, and a .22 caliber pistol. Crockett knew by the time of his own arrest that the Defendant had already been arrested for the killing he observed. Shortly after he was arrested, Detective Harold Dean Haney met with Crockett, questioning him about the killing. For several hours, Crockett denied knowing anything about the killing. At trial, he explained that he initially lied because he felt he was not responsible for the killing. Soon, however, the fact that the man "got killed like that" overwhelmed Crockett, so he divulged what he knew about the killing.

Crockett denied Detective Haney offered to give him a deal or to treat him more lightly in exchange for his statement. He said investigators told him only that they would

take his cooperation into consideration in dealing with the charges against him related to this killing.

On cross-examination, Crockett confirmed he, like the Defendant, had been charged with first degree murder, felony murder, and especially aggravated robbery. Additionally, Crockett had been charged with felonious possession of crack cocaine for resale, possession of drug paraphernalia, and possession of a weapon. He agreed that he would like to avoid receiving consecutive sentences.

Crockett confirmed that, in the first hour of his interview with Detective Haney, he acknowledged being acquainted with the Defendant. He agreed that, after the detective and other interviewing officers interviewed him for several hours, telling him he should "help himself" because he was "in the middle" of the killing, he began to feel the investigation was centering on him.

Crockett agreed that he was friends with a man named Bronson Coleman and that Coleman was physically similar to the Defendant because he was about five feet, seven inches tall, dark skinned, and wore his hair in braids.

Crockett recalled that on the morning of April 23, 2006, after he woke up at his home in Parkwood, he took a bus to a friend's house on May Street, and that he walked from this friend's house to the public park, which was about five minutes away, to play basketball. He recalled he was wearing black shorts, a white t-shirt, and a red, white, and blue hat. Crockett did not know the names of the people he played basketball with at the park.

Crockett recalled that the Defendant was wearing a red t-shirt, blue shorts, and a red hat on April 23. He explained that he could not see the gun the Defendant obviously had been carrying because the Defendant was wearing very oversized clothing. He did not know how much money the Defendant displayed to him when he showed him the cash he had for the car, though he testified the victim was asking for six to eight hundred dollars for the car. Crockett did not know how much the victim wanted for the sound system alone.

Because Crockett's ears started ringing after two or three gun shots, he was not sure how many times the Defendant shot the victim. He recalled that several people were on Hester's front porch when they drove by but that Hester was the only one that could possibly have seen the shooting, though bushes would have obscured his view. Crockett denied that he had ever bought or sold drugs from Hester or that he had ever been Hester's "do boy." Crockett was not sure whether the Defendant smoked cigarettes or cigars but was certain the Defendant used his own lighter to set the victim's clothing on fire. He explained that, after the Defendant set the victim's clothing and shoes on fire, he placed the flaming mass on the

6

road and immediately told Crockett to drive away. Also, Crockett clarified that, after he parked the car outside the store where he claimed a friend worked, he simply got out of the car and walked down the street. He explained that, because they were in a public area, he did not believe the Defendant would shoot him if he fled in this way.

Crockett stated that, before his October 2006 arrest for selling crack cocaine, he had only been selling drugs for about six weeks. He carried the .22 caliber pistol because he was selling drugs. He acknowledged that he also owned a .32 caliber rifle, which police seized from his home. Crockett denied that he had ever had a "falling out" with the Defendant over money. He also denied that Bronson Coleman, with whom he had been friends for over six years, was actually the shooter and that he was falsely identifying the Defendant as the shooter to protect Coleman.

Genesis Hester testified that his sister and the Defendant have a child together and that he is not the Defendant's father. Before the shooting, Hester knew the Defendant only as "T.J. Davis." He said he resided at 234 Old Amqui Road with his mother, two sisters, two brothers, and three nieces and nephews at the time of the shooting.

On April 23, 2006, Hester was at his home along with the rest of his family. Standing outside, Hester saw a Cutlass with a nice paint job and a pair of twenty-two inch tires drive past his house toward the end of the Old Amqui Road. He recalled that the Cutlass was carrying three people. Two houses and an empty lot separate Hester's home from where Old Amqui Road dead ends. Two to three minutes after the car passed Hester's house, he heard gun shots coming from the direction in which the car had traveled. About two minutes after these shots, the car drove back by Hester's house, going the opposite direction and carrying only two people.

The car stopped in front of Hester's house, and the Defendant was seated in the passenger seat, which faced Hester's house. He recognized the driver as a man he knew through the Defendant only as "Mike." The Defendant then said to Hester, "Look at my new rims," and started to turn the hydraulic switches up and down, which caused the car to go up and down. Hester asked the Defendant, "What were those gunshots?" to which the Defendant replied, "I don't know what you're talking about." The car then drove off. Hester and the driver, "Mike," never spoke during this exchange.

Hester never went to the end of his street to investigate whether the Defendant had shot someone, and he did not call police. About four or five hours later, emergency personnel and police began to arrive. Hester still did not report his exchange with the Defendant to police. Hester explained that he wished to avoid contact with the police because he was selling drugs from his home. When a police officer came to his house to

7

question him about the killing, he summoned his mother and had her speak with the police in his stead.

In June 2006, police executed a drug search warrant on Hester's house and arrested Hester as well as several other people. Two or three days after his arrest, Detective Anderson questioned him about the killing, and he told the detective what he had seen. Hester said he divulged this information because he "had nothing else to lose" and because, having watched television specials about unsolved murders, he felt bad about the situation. He said that when he finally did disclose what he witnessed of the victim's murder, he did not do so with the expectation that police would help him with his drug charges. He testified, however, that he had been offered a sentence of six years of probation to be served at thirty percent for his drug charges if he testified in this case.

Hester confirmed he testified at the Defendant's preliminary hearing and that he had reviewed recordings of his original statement to police and of his preliminary hearing testimony. He confirmed that one of the other people arrested at his home in June 2006 was Sharika Holt. He also confirmed that when he returned to his home after being released from jail, quite a few items were missing from his home.

On cross-examination, Hester clarified that, when he was arrested at his home in June 2006, he was on bond, for a previous cocaine sale charge. The State offered a plea deal of six months of probation on that charge, as well. Hester understood he would have to serve his sentence from convictions stemming from his June 2006 arrest consecutively to this six-month sentence.

Hester estimated he heard about three gunshots coming from the end of Old Amqui Road. He did not believe the rest of his family heard the gunshots, and he never talked about the incident with anyone else in his family. He explained that part of the reason the family never discussed the shooting was that the rest of his family went to bed early in order to go to church the next morning.

Hester testified that police recovered a set of twenty-inch "Boss" rims from his house when they executed the June 2006 search warrant and that these were not the rims taken from the victim's car, which he said were twenty-two inch rims. He testified he sold powder cocaine, and nothing else, from his home. Hester denied that Crockett had ever worked for him, and he said he did not know Bronson Coleman.

Johnny Lawrence, an officer in the identification section of the Metro Nashville Police Department, testified that on April 28, 2006, he examined a burned Cutlass that was brought to his laboratory. Investigating officers requested Officer Lawrence search the car for latent

fingerprints, so the officer photographed the car, and examined the unburned portions of the car for fingerprints. The State entered as exhibits A-D four photographs of the car, which the officer confirmed he took. Officer Lawrence agreed that Exhibit B, a photograph of the exterior of the car, showed that one wheel had only three lugnuts whereas most American wheels have five lugnuts. He agreed that Exhibit C, a photograph taken looking through the passenger window, showed electric wiring hanging from the dashboard. The officer surmised the wiring either ran to stereo speakers or was part of the car's electric wiring. He found no speakers, stereo equipment, or burned remains in the car.

Officer Lawrence lifted several latent prints from the front of the car's hood. The officer testified that, given that the car had been set on fire and later doused with water, he was surprised to find any prints at all. Fearing that an attempt to lift the prints would destroy them, he instead only photographed the prints and turned the photographs in for examination.

Harold Dean Haney, a detective in the North Precinct Investigations Unit of the Metro Nashville Police Department, testified he was assigned to the victim's death. The victim's body was undisturbed when he arrived to where the body had been found on Old Amqui Road. Having nothing to identify the victim, he enlisted the aid of Officer Fernandez, who put them in touch with Juan Acosta. Detective Haney met with Acosta at Acosta's daughter's apartment on Murfreesboro Road. Acosta identified the victim as Moreno-Gutierrez and gave the detective the victim's laptop computer along with several other of the victim's belongings.

Detective Haney found several photographs of the victim on the laptop. He also found several photographs of the Cutlass police recovered in this case. He testified that, given the buildings in the background, the pictures appeared to have been taken in Madison. These pictures showed the Cutlass's license plate number and a "FOR SALE" sign in the back window. Another photograph showed a CD and DVD stereo system and a six-inch TFT monitor. A stereo box with punch speakers appeared to be inside the car's trunk in another picture. The control box for a hydraulic system appeared in another photograph.

The detective obtained a pair of the victim's shoes, which were size 9.5, the certificate of title to the victim's Cutlass, and the victim's cell phone number. Detective Haney obtained a subpoena for the records pertaining to the victim's cell phone number. Reviewing a copy of these records, the detective confirmed that the last activity on the victim's cell phone were calls placed to and received from 615-416-9281. Accordingly, the detective subpoenaed the cell phone records pertaining to this number and found that this number was registered to the Defendant. This information is what originally led the detective to investigate the Defendant.

Detective Haney testified that, given the proximity of the victim's body to Hester's house, where police knew drugs were sold, he informed the narcotics unit that Hester might have information about a homicide. He asked the narcotics unit to inform him in the event they arrested Hester. The narcotics unit arrested Hester in June 2006, and they informed Detective Haney, who interviewed Hester in jail on June 16, 2006. The detective said he neither offered Hester anything in exchange for talking to him about the shooting nor informed Hester of the cell phone records linking the Defendant to the victim.

Based on what he learned from Hester, Detective Haney obtained an arrest warrant for the Defendant, which he executed on June 21, 2006, when he arrested the Defendant at the home of the Defendant's sister, Markia Winters. The detective obtained a search warrant for Winters's home, which he served later that same day. He found car stereo equipment inside the closet of the front room of the home. The State entered into evidence the stereo equipment found at Winters's home. The detective testified that this stereo equipment had unique markings due to wear and tear that were identical to markings on the photographed stereo equipment on the victim's laptop. Given this similarity, Detective Haney concluded that the stereo equipment in Winters's house belonged to the victim.

Detective Haney also recovered assorted pieces of stereo equipment hardware from Winters's home. Among other things, he found a Rockford Fosgate amplifier, a monitor mount, and a "monster" cable used for audio hookups, which generally are installed inside a car door. Most of the hardware's wiring had been cut away from its original source. The detective also found several four-inch speakers wires, two of which were Pioneer speakers wires. Finally, the detective recovered an Audio Video Entertainment ("AVE") six-inch TFT LCD monitor and a JVC CD-DVD stereo system. Detective Haney testified that the laptop photographs of the victim's car showed that the monitor installed in his car was an "AVE" monitor and that his stereo system was a JVC system. From this, and from the fact that the monitor and stereo systems found in Winters's house were similar in all other respects to those in the photographs on the victim's laptop, Detective Haney concluded that the recovered equipment came from the victim's car.

Detective Haney confirmed he interviewed Michael Crockett on October 12, 2006, after Crockett had been arrested in an unrelated incident. Detective Haney confirmed that Crockett was carrying a .22 caliber rifle when he was arrested. He also testified that Crockett had been carrying a .32 caliber rifle when he was arrested on an earlier charge that predated Moreno-Gutierrez's death. The detective said he did not offer Crockett leniency in exchange for his statement about the killing. Also, the detective confirmed that he received three bullets from the medical examiner, which he recovered in the course of the victim's autopsy.

10

The detective said that officers saw a pair of rims in Hester's house the day they arrested him. One day later, after he interviewed Hester, Detective Haney went to Hester's house to view these rims; however, the rims were no longer in Hester's house.

On cross-examination, Detective Haney confirmed he was lead detective in this case, recalling that his team searched all of Old Amqui Road, a nearby trailer park, and a few nearby businesses for evidence related to the killing. He said his team did not find any burned clothing or shoes on or near East Campbell road, where Crockett said the Defendant left the victim's clothing after he set it on fire. The detective agreed that the stereo equipment found in the Defendant's sister's house was what the Defendant would possess had he bought only the stereo system from the victim.

Recalling his interview with Crockett, Detective Haney maintained that he never offered Crockett anything in return for his statement but confirmed that he encouraged Crockett to disclose what he knew in order to protect himself. The detective said that he was not aware of anyone visiting Hester or of Hester placing a phone call to anyone after he was arrested.

Dr. Staci Turner, an assistant medical examiner for Davidson County and an expert in the field of forensic pathology, performed an autopsy on Morena-Gutierrez on April 24, 2006. Reviewing the victim's autopsy report, she testified that he suffered seven gunshot wounds to the head and one gunshot wound to the left shoulder. Of the seven gunshot wounds to the victim's head, only three would have been fatal and the remaining four passed through the victim's scalp. The doctor determined that one of the fatal shots was fired while the gun was pressed against the victim's head. She could not say from where the gun was fired for the remaining shots, but she was certain that the same gun could have caused all of the gunshot wounds. She testified that the victim's cause of death was multiple gunshot wounds and his manner of death was homicide.

On cross examination, Dr. Turner agreed that the four bullets that did not embed in the victim's head could have come to rest outside the victim's body, but she said she had no way of knowing where the bullets would have landed.

Jean McCormick, an officer with the North Crime Suppression Unit of the Metro Nashville Police Department, testified she was part of the team that searched Hester's home. McCormick testified that as she walked through the house's back door onto the patio and looked to the right, she saw four tires stacked up on top of each other in a corner. Viewing a photograph of the rims believed to be taken from the victim's car, she said the rims in the photograph were not the rims on the tires she saw on Hester's back patio.

11

On cross-examination, Officer McCormick agreed that she primarily was searching for drugs or weapons rather than rims when she searched Hester's house and that it was dark outside when she saw the rims on the patio. She agreed that many items were spread out around the back patio of the house and that, as a result, she may not have noticed if another set of rims was present.

Thomas E. Simpkins, an officer with the Metro Nashville Police Department, participated in the execution of the search warrant of Marika Winters's house on June 21, 2006. He was tasked with photographing several items to be seized and searching for fingerprints. He photographed a JVC car stereo, a Punch speaker box, a Cutlass Supreme decal, a collection of car speakers, and a pair of shoes, which were all found in a closet on the first floor of the home. Officer Simpkins was able to lift latent finger prints from the AVE box, the JVC car stereo, and two scan disks.

Larry Farnow, a Police Identification Specialist II with the Metro Nashville Police Department Identification Division, explained his job involved evaluating latent finger prints and comparing the print to prints contained in the Automated Fingerprint Identification System ("AFIS"). The officer received the two latent finger prints lifted from the hood of the burned out Cutlass. He was able to match one of these prints to the victim, but the other print was of "no value," meaning it contained insufficient ridge detail from which to construct a print profile.

Officer Farnow also received the latent fingerprints collected from the stereo equipment found in Winters's home. Of these, nine were of no value, but one contained an identifiable print. The officer identified this print as the same as the right index finger on the ten-print card taken from the Defendant.

Michael L. Pyburn, an officer with the Metro Nashville Police Department and an expert in firearm and toolmark examination, testified he received a discharged bullet and two undischarged cartridges from Officer Matthews, who recovered them from the scene of the victim's killing. He testified the unfired cartridges were .380 caliber automatic cartridges manufactured by Winchester, which ordinarily are fired from a semi-automatic pistol. He testified that the discharged bullet was a .32 caliber bullet and the number of lines and grooves it contained indicated it was fired from a revolver.

Officer Pyburn also received three metal-jacketed lead bullets from the medical examiner, who found the bullets lodged in the victim's brain and neck. He testified each bullet was a .32 caliber automatic bullet fired from the same unknown firearm. He said the majority of .32 caliber revolvers carry eight bullets, though some carry only five.

12

On cross-examination, Officer Pyburn said that a .38 caliber bullet could not have been fired from a .32 caliber revolver. He agreed, therefore, that the .38 caliber bullets found at the scene of the killing could not have come from the .32 caliber revolver that fired the .32 caliber bullets found in the victim's head.

The State rested its case, and the defense then called Xuandra Scruggs, who dated the Defendant for two years while she was in high school. Scruggs testified that on April 23, 2006, around 12:30 p.m., the Defendant called her and asked her to pick him up at the public park in Madison. She said that when she arrived, the Defendant's friend "Danny" and a Hispanic male were at the park with him. She recalled that the Hispanic man was driving a "fixed up older model car." She said the Defendant bought speakers from the Hispanic man, put the speakers in Scruggs's trunk, and they left.

Scruggs acknowledged that she gave a statement to Detective Haney in which she denied picking the Defendant up at Madison Park and denied allowing the Defendant to put a stereo in her trunk. She explained that she denied these things because she did not understand that Madison Park was the park she knew as "the center," and because she allowed the Defendant to put speakers, and not a stereo, in her trunk.

Scruggs continued her account of April 23, 2006, testifying that, after she and the Defendant left the park, they drove to Green Hills, waited for a friend to get off work, and then picked up the friend and drove her home. She said she and the Defendant then returned to her house between 4:00 and 5:00 p.m. She said the Defendant was living with her at that time, so he stayed at her house that night. Scruggs said that the speakers remained in her trunk for "a while" but that she took them inside her house and placed them in a closet so they would not be stolen. After the speakers had been in her house a month, she and the Defendant had an argument, so he moved his belongings, including the speakers, to his sister's house. Again, she acknowledged telling Detective Haney she did not allow the Defendant to store a stereo in her home but explained she believed the detective was referring to a home stereo rather than a simple set of speakers. She confirmed that the speakers entered into evidence as those seized from Winters's home were the speakers the Defendant stored in her trunk and, later, her closet.

In the three to four years Scruggs had known the Defendant, she had not known him to either smoke or carry a cigarette lighter. Scruggs identified a photograph of the victim's car and stated it looked similar to the car she saw the Hispanic man driving. She viewed a photograph of the victim and said the man pictured looked like the Hispanic man she saw in the park with the Defendant.

On cross-examination, Scruggs confirmed that, when she gave her statement to

13

Detective Haney on June 22, 2006, she knew that the Defendant had already been arrested. She agreed that, when she spoke with Detective Haney, she had not spoken with the Defendant since his arrest. Scruggs agreed she knew the Defendant was charged with murder, and the interview was critical to herself, the police, and the Defendant. She reiterated, however, that she did not realize that the detective was referencing the park she knew as "the center" when he asked her about Madison Park. Scruggs explained that the name, "the center," by which she knew Madison Park, referred to the recreational center in the middle of the park.

She said she did not remember Detective Haney saying during the interview, "We're talking about the park over around the center." The State played a two-minute portion of her interview with the detective in which the detective clarifies that, in asking her whether she met the Defendant at "Madison Park," he is referring to the park that encircles the center. After the tape was played, Scruggs maintained that she did not hear the detective give this description during their interview. She said that the Defendant informed her a few days after her interview with the detective that he was alleged to have killed a Hispanic man and stolen his stereo equipment. She said that, at this point, she remembered that she had picked up the Defendant at Madison Park and let him store his stereo equipment in her trunk. She said that, since remembering these events, informing police of this potentially exculpatory information simply did not cross her mind. She also said she was "trying to stay away from all of it." She testified that she did not tell anyone that the Hispanic man the Defendant was accused of killing was alive when she picked the Defendant up from the park because she did not know whom in the police department to contact. Scruggs suggested again that she did not disclose this information because she wanted "to keep [herself] out of trouble." Scruggs said the Defendant was "not currently" her boyfriend and that the last time she had seen him was one and a half months before trial.

Katherine Green, an employee of R.W. Back, Inc., located at 400 Professional Park Drive in Goodlettsville, Tennessee, testified that she left work to pick up lunch, and, when she returned, she followed a car driven by a white man in his forties or fifties with light hair into the parking lot. Later, while she was eating her lunch in the break room, another employee suggested she move her car because a car had been set on fire very near to her car. Green saw the car that was on fire and realized it was the car she had followed into the parking lot.

The State called Detective Haney as a rebuttal witness. Detective Haney confirmed he and Detective Danny Satterfield repeatedly asked Scruggs whether she picked up the Defendant and any sound system or stereo equipment, but Scruggs denied that she had. He also confirmed that he explained to Scruggs that, in referring to "Madison Park," he meant the park containing the area she knew as "the center." He said that, during the interview, the

14

park they were referring to was perfectly clear.

The jury convicted the Defendant of first degree felony murder, first degree premeditated murder, and especially aggravated robbery. The trial court merged the two murder convictions and imposed a life sentence for Moreno-Gutierrez's murder. The trial court conducted a sentencing hearing wherein it reviewed the presentence report and heard testimony from several witnesses. According to the presentence report, the Defendant was nineteen at the time of Moreno-Gutierrez's death and twenty at the time of trial. He dropped out of high school his senior year. He stated to the officer preparing the investigation report that he attempted suicide in 2001 and subsequently received mental health treatment. The Defendant is unmarried and has one son. His previous convictions included driving on a suspended license and criminal impersonation.

The presentence report included a statement by the Defendant disclaiming involvement in the victim's death. In the statement the Defendant said he met the victim by chance at Madison Park and exchanged numbers with the victim to discuss purchasing his car. He says he called the victim the next day and arranged to meet him at the park again. He met the victim, inspected the car's engine, and decided to only buy the car's speakers. He said the victim helped him load the speakers into Scruggs's car, and then he and Scruggs left the park.

The report includes two victim impact statements, one from Sylvia Fregoso and the other from Norma Carmona, that describe the victim's family's painful reaction to his death and ask the court to impose a sentence that would prevent the Defendant from ever being released. Moreno-Gutierrez's cousin, Sylvia Fregoso, testified that her grandmother raised Moreno-Gutierrez since his mother died when he was three years old. She introduced a letter from his grandmother who resided in Guadalajara, Mexico. The letter described her grief over her grandson's death and her hope that the Defendant would face justice. Betty Carmona, another cousin of Moreno-Gutierrez, testified that her cousin had surmounted enormous difficulties, such as his mother's death, and remained a positive member of society and of his family. She said he worked and sent money to his grandmother in Mexico. She expressed her anger at the Defendant for depriving her family of such a beloved person as Moreno-Gutierrez.

Also at the sentencing hearing, Detective James Fuqua, an investigator in the North Precinct of the Metro Nashville Police Department, described his investigation of the Defendant's involvement in the murder of Michael Adams, which occurred after Moreno-Gutierrez's murder. At the time of sentencing, the Defendant had not yet been tried for his involvement in Adams's death. The detective testified that on June 5, 2006, he arrived at Adams's apartment in Madison, Tennessee, where Adams's body was found. This was six

15

weeks after Moreno-Gutierrez was murdered. He recalled that Adams's front door had been kicked in and that a blood trail led from the kitchen to the living room, where he found Adams's body slumped over at the knees, appearing to have been shot in the head. He testified that an examination later revealed Adams had been shot once in the head, once in the shoulder, and once in the chest. He recalled that the apartment had been "ransacked" and that Adams's 2004 Chevrolet Silverado was missing. Officers later recovered the victim's Silverado in Hermitage, Tennessee. The detective said the truck had been so badly burned that it was of no evidentiary value.

The detective testified that, when the Defendant was arrested on charges that he murdered Moreno-Gutierrez, police found several of Adams's belongings in the Defendant's possession, such as prescription medications and martial arts knives, which Adams collected. Also, the bullets that killed Moreno-Gutierrez and the bullets that killed Adams were all .32 caliber rounds that analysis determined to have been fired from the same gun. Detective Fuqua interviewed Michael Crockett, the Defendant's co-defendant in Moreno-Gutierrez's murder, and he corroborated other evidence implicating the Defendant in Adams's murder.

On cross-examination, the detective confirmed he learned during his investigation that Crockett and another man had helped Adams move into his apartment. He agreed that this would have given Crockett the opportunity to view Adams's collection of knives. The detective said his investigative team never determined whether the Defendant's foot could have left the footprint left on the kicked-in door of Adams's apartment. He also acknowledged that he did not know how many people stayed at the Defendant's sister's home, where Adams's belonging were found during the Defendant's arrest. Finally, he confirmed his team never found the gun used to kill Adams and Moreno-Gutierrez.

The trial court noted that it was required to ensure the punishment was justly deserved in relationship to the seriousness of the offense and to preserve prison capacity for the most severe offenses committed by those possessing criminal histories evidencing a clear disregard for the law. The court found that enhancement factors (1), that the Defendant had a history of criminal behavior, and (2), that the Defendant was the leader in the commission of a felony, applied to the Defendant's conviction for especially aggravated robbery. It sentenced the Defendant to twenty-three years for his especially aggravated robbery conviction.

The trial court found that the record established by clear and convincing evidence that the Defendant murdered Adams shortly after he murdered Moreno-Gutierrez. Based on this conduct, the trial court found that the Defendant was a "dangerous offender" as defined by consecutive sentencing factor (4) and ordered his sentences to be served consecutively for a total sentence of life plus twenty-three years.

## B. Davis II

In June 2008, the Defendant was tried for Michael Adams's robbery and murder. At this trial, the following evidence was presented: Cody O'Quinn, a Metro Nashville Police Department investigator, testified he received a call from a woman who requested a welfare check at the apartment at 311 Nix Drive because no one had heard from its resident, Michael Adams, in three or four days. When the investigator arrived at the apartment, Adams's truck was not at his residence. The officer approached the door to the apartment and found it slightly ajar and marked with a footprint. He tried to push the door open, but the door would only open six to eight inches before it struck molding knocked loose from its frame. He called out for Adams but received no response. The officer forced the door open and immediately noticed droplets of blood on the kitchen floor. He then summoned his sergeant and did not enter the apartment until his sergeant and another officer arrived.

As he entered the apartment he noticed the apartment smelled "bad," and the kitchen was slightly disheveled. As he looked into the living room from the kitchen he saw smudges of blood down the arm of a sofa that was facing the kitchen. The officer continued on into the living room, which had been ransacked, and he found Adams's body lying on the floor positioned on his stomach with his legs tucked underneath his torso and his head on the floor. Blood had pooled on the carpet underneath the left side of Adams's head, and a computer printer lying nearby on the floor was splattered with blood. Having found Adams's body, the officer retreated from the apartment, roped it off, and called precinct detectives.

Dr. Amy R. McMaster, an expert in the field of forensic pathology, supervised Adams's autopsy, which revealed that Adams suffered three gun shot wounds: one to the head, one to the shoulder, and one to the left side of the abdomen. The gun shot wound to Adams's head entered from the top and traveled downward but would not necessarily have been fatal because it did not enter his brain or skull. The gun shot wound to his shoulder, however, would have been fatal because after it entered his shoulder, it traveled downward, puncturing a lung and his aorta. Dr. McMaster estimated this wound would have killed Adams in less than a few minutes. The gun shot wound to Adams's abdomen would also have been fatal because, after it entered the left side of the abdomen, it injured the stomach and the mesentery, which supports and nourishes the stomach. The doctor said this wound would not, however, have caused Adams's death as quickly as the wound to his lung and aorta.

The doctor recovered the bullets from Adams's two gunshot wounds and delivered them to investigating officers. She testified that, given Adams's body temperature, he had been dead at least one day when his body was found. Also, she said his body tested negative for the presence of drugs. The doctor testified his cause of death was multiple gunshot

17

wounds and his manner of death was homicide.

Felicia Evans, a crime scene investigator for the Metro Nashville Police Department, produced a diagram of the scene within Adams's apartment. Reviewing the diagram, Officer Evans said it showed that someone had forced open not only the entrance opening into the kitchen but also the entrance to the back bedroom from a bathroom. Pictures of the apartment showed droplets of blood on the floor in front of the refrigerator and a trail of blood leading from the kitchen, down the hallway, and into the living room. The pictures also showed a shirt lying in the hallway alongside the refrigerator, a blood smear on the arm of a couch, and the victim's body lying in front of a door.

Officer Evans, along with other officers, searched Adams's home for fingerprints and ballistic evidence. They located several fingerprints, which they turned over for further examination. They did not find any ballistics evidence.

The State entered the following stipulation as to the events of April 23 and 24, 2006: "The parties agree that the State could present evidence that would establish that on April 23rd or 24th of 2006 the [D]efendant fired a gun outside of 206 Old Amqui Road in Madison, Tennessee and the police collected fired bullets. The jury should consider these facts as proven."

Harold Dean Haney, a detective with the North Precinct Investigation Unit of the Metro Nashville Police Department, testified he was involved in the investigation of the Defendant in 2006. He confirmed that he and other officers arrested the Defendant on June 21, 2006, at his sister's home. He recalled that, after he arrested the Defendant, he and several other officer's searched the home and found several prescription pill bottles inside a pillow case in a kitchen closet. These pill bottles bore prescription labels written out to Michael Adams, Marilyn Adams, and Mary Wooding. They collected the pill bottles and submitted them for fingerprint analysis. The officers also collected five unique, "Gothic looking" knives in the home.

On cross-examination, Detective Haney said he did not know whether Sheylean Hester, Genesis Hester's sister and the mother of the Defendant's son, was living at the Defendant's sister's house. Also, he said he did not know the results of the fingerprint analysis of the pill bottles taken from the Defendant's sister's home.

Johnny C. Lawrence, an officer in the identification section of the technical services of the Nashville Metro Police Department, photographed Adams's vehicle after it was found on Central Pike in Hermitage, Tennessee. The truck had been pulled up behind a building to where it was barely visible from Central Pike and severely burned. Officers found the

18

vehicle's license plate at the scene. After officers retrieved items from the vehicle, it was towed to a lot operated by the police department.

Officer Lawrence was tasked with examining the pill bottles collected from the Defendant's sister's home. He located a partial fingerprint from one of the bottles, lifted the print, and submitted it for comparison analysis.

William Kirby, an officer in the identification crime scene section of the Metro Nashville Police department, testified he processed a burned Chevrolet Avalanche on June 10, 2006. The officer was only able to process a small amount of paint that was not burned off the vehicle's exterior. He was unable, however, to lift fingerprints from this paint section.

Thomas E. Simpkins, an officer in the identification section of the Metro Police Department, processed and photographed the knives collected from the Defendant's sister's home during his arrest. Officer Simpkins was able to develop and lift a fingerprint from each knife. He submitted these prints for comparison analysis.

Brenda Russell, an expert in latent fingerprint examination and a Metro Nashville Police Department officer, received the fingerprints recovered during the Adams death investigation. None of the prints were clear enough to compare them against profiles contained within the Automated Fingerprint Identification System ("AFIS"). Two of the prints, however, were clear enough to examine under a magnifying glass and determine that they belonged to Adams. On cross-examination, Officer Russell agreed that she did not receive any fingerprints that belonged to the Defendant.

Alex Brodhag, a firearms examiner in the forensic services division of the Tennessee Bureau of Investigation ("TBI"), explained he could determine whether a bullet was fired from a specific firearm by examining the unique markings that a firearm leaves on the surface of a bullet it fires. He said that two identical guns made by the same manufacturer would each leave unique markings. Detectives sent Agent Brodhag four bullets they collected on Old Amqui Road on April 23 or 24, 2006. Also, Dr. McMaster sent the agent two bullets she recovered from Adams's body. Agent Brodhag examined each of the six bullets submitted to him for examination and determined each was fired from the same barrel in the same .32 caliber weapon. Agent Brodhag said the weight of the bullets he received for analysis suggested they were fired from a .32 caliber automatic cartridge, which normally is fired from a pistol.

Marilyn Adams, the victim's mother, testified her son had lived at his apartment only one month before he was killed. She said he had several jobs including servicing computers

in medical offices, working for Dell, and selling real estate. Ms. Adams testified she kept several prescription medications, including Oxycontin, at her son's apartment when she left town because her family cautioned her against traveling with Oxycontin. Viewing the pill bottles seized during the Defendant's arrest, she confirmed that several of the bottles belonged to her. Ms. Adams said her son previously was married to Mary Evelyn Woody, to whom the remaining bottles were prescribed.

James Court Kolter, the victim's brother, recalled he and his brother used to attend knife shows together and purchase unique knives. Viewing the knives seized from Winters's home, he said he had seen three of the knives on display in his brother's living room. One of the remaining two knives also looked familiar to Kolter. Viewing photographs of the burned-out Chevrolet Avalanche, he confirmed the vehicle was his brother's.

Sherylean Hester testified that she and the Defendant had a child together in June 2005. In June 2006, she was still dating the Defendant, and she was living with her brother, Genesis Hester, on Old Amqui Road. She said her son and five of her brother's friends also lived with them on Old Amqui Road. Hester testified she commonly heard gunshots on Old Amqui Road during April, May, and June of 2006. Sherylean Hester moved from the house in June 2006 to live with her sister, but she left behind some clothing.

Hester recalled that, after police searched her brother's house on Old Amqui Road, she asked the Defendant to retrieve some of her clothing from the house. He did so and returned with two bags: one containing her and her son's clothing and another containing prescription pill bottles. She said the bags did not contain knives, and the Defendant took the bag of pill bottles with him when he left.

Julia Eggers, a real estate broker who also owned and managed rental property, testified she met the victim when he worked on her business computers. He subsequently rented his apartment from her. She said she and Adams had only a "close" friendship beyond their business dealings and denied having an intimate relationship with him. She also denied that her husband and the Defendant had ever fought, though she said her husband occasionally became frustrated with the Defendant over computer issues.

Robert Eggers, Julia Eggers's husband, said he knew the victim because he serviced his wife's business computers. He said his wife's relationship with the victim was "strictly professional," though he acknowledged they occasionally had lunch together. He denied ever suspecting the two had a romantic relationship or becoming angry over such a suspicion.

In rebuttal for the State, the victim's mother, Ms. Adams, recalled an occasion she and her son stopped by Julia Eggers's office, and Robert Eggers pulled up and began to threaten

20

her son. She recalled that Mr. Eggers, who was intoxicated and angry, cursed at Adams, calling him a "son of a bitch," and saying "he was going to kill [her son's] ass." Ms. Adams said her son went inside in order to diffuse the situation, while she stayed outside and spoke with Mr. Eggers.

After hearing the above evidence, the jury convicted the Defendant of felony murder, premeditated murder, and especially aggravated burglary. The trial court merged the two murder convictions, and it conducted a sentencing hearing. The trial court imposed a life sentence as to the murder conviction and an eighteen-year sentence for the especially aggravated robbery conviction. Finding that the Defendant was a dangerous offender, the trial court ordered these sentences to be served consecutively for a total sentence of life plus eighteen years.

## II. Analysis

On appeal, the Defendant contends that the evidence was insufficient to establish his identity as the perpetrator in either Davis I or Davis II and that the trial court improperly imposed consecutive sentencing in Davis I.

## A. Sufficiency of the Evidence

The Defendant contends the evidence offered at trial in Davis I is insufficient to support his convictions for first degree murder and especially aggravated robbery. Specifically, he asserts that the testimony that he was the perpetrator of Moreno-Gutierrez's robbery/murder was unreliable and that his girlfriend's alibi testimony established that he could not have been the perpetrator. The State responds that, because the jury was entitled to credit the former testimony and discredit the latter, the record sufficiently supports the Defendant's convictions in Davis I.

As to Davis II, the Defendant contends the record does not support his convictions because it contains no forensic evidence connecting him to Adams's murder. The State responds that adequate circumstantial evidence establishes the Defendant's identity as the perpetrator of Adams's robbery/murder.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence,

circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn.1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App.1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

**1. Davis I**

22

The record in Davis I contains direct evidence that the Defendant was the perpetrator of victim Moreno-Gutierrez's murder. Co-defendant Crockett testified that he accompanied the Defendant as he drove the victim's Cutlass past Genesis Hester's house to a secluded location, ordered the victim out of the car, shot the victim several times, and left, briefly stopping at Hester's house. Ample circumstantial evidence corroborates Crockett's account: Genesis Hester testified that a car carrying the Defendant and two males drove past his house on the day of the victim's death and returned minutes later with the Defendant and only one other male. Between when the car arrived and departed, Hester heard several gunshots. Phone records show that the last calls on the victim's cell phone were placed to and received from the Defendant. The stereo equipment featured in pictures found of the Cutlass on Moreno-Gutierrez's computer was missing when police later found the Cutlass abandoned and partially burned. Police later found this stereo equipment in a closet of the home in which the Defendant was living when he was arrested. The Defendant agreed that he had contacted and met with the victim but claimed he only purchased stereo equipment from him.

In conflict with the preceding evidence, Xundra Scruggs, the Defendant's ex-girlfriend, testified that on the day of the victim's death she gave the Defendant a ride after he briefly met with the victim at Madison Park. She testified the Defendant spoke with the victim, purchased the victim's stereo equipment, and placed the equipment in the trunk of her car. She said the victim was alive when they left the park and that she and the Defendant spent the remainder of the evening together. No evidence corroborates Xundra Scruggs's account. The jury was entitled to reject Scruggs's testimony, as it apparently did in reaching a guilty verdict. *See Bland*, 958 S.W.2d at 659.

Resolving all conflicts in favor of the State, we conclude the record establishes that the Defendant met with the victim on the pretense of buying his car and took the car for a "test drive" to a secluded location where he ordered the victim out of the car, shot him execution-style, and drove away with the victim's car, which he stripped of its rims and stereo equipment and abandoned. Based on these facts, "any rational trier of fact could have found" that the Defendant was the perpetrator of the victim's murder and especially aggravated robbery. *See Jackson v. Virginia,* 443 U.S. at 319. As such, the evidence is sufficient to support the Defendant's convictions for first-degree murder and especially aggravated robbery in Davis I. He is not entitled to relief on this issue.

## 2. Davis II

With regard to the Defendant's claim that the largely circumstantial evidence supporting his convictions in Davis II was insufficient to support to establish his identity as Adam's assailant, we similarly find the record sufficient. As discussed above, where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly

23

at the Defendant and the Defendant alone," circumstantial evidence alone may support a guilty verdict. *See Smith*, 868 S.W.2d at 569. Further, the jury decides "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence." *See Rice*, 184 S.W.3d at 662.

The record in Davis II establishes the following facts: The gun used to kill victim Adams was the same gun that the Defendant fired in April 2006. Also, when the Defendant was arrested several weeks after Adams's death, he was in possession of several prescription pill bottles and a knife collection that were missing from victim Adams's apartment. Sherylean Hester insisted in her testimony that the Defendant obtained the pill bottles from her brother's house; however, the jury was entitled to discredit her testimony. *See Bland*, 958 S.W.2d at 659. Moreover, the jury was entitled to give more weight to the circumstantial evidence that the Defendant murdered victim Adams than to Hester's testimony. *See Rice* 184 S.W.3d at 662. In our view, the facts connecting the Defendant to both the instrumentality of and the fruit from Adams's robbery-murder are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *See Smith*, 868 S.W.2d at 569. As such, we conclude that any rational trier of fact could have found that the Defendant was the perpetrator of Adams's murder and that, as a result, the record sufficiently supports the Defendant's convictions for first degree murder and especially aggravated robbery. He is not entitled to relief on this issue.

## B. Sentencing

The Defendant contends the trial court erred when it imposed consecutive sentencing in Davis I because it partially based its finding that the Defendant was a dangerous offender on its finding that the Defendant murdered Adams, though he had not yet been convicted of so doing. The State responds first that the Defendant waives his objection to this sentencing issue because he failed to cite to the record or relevant authorities in support of his argument. Further, the State continues, the trial court's reliance on the Defendant's involvement in Adams's death was proper because a dangerous offender classification need not be based on behavior for which a defendant has been convicted.

In the interest of justice, we will address the Defendant's objection to his sentence although his brief lacks adequate citation to the record and relevant authorities. It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, one of seven factors applicable to the case. T.C.A. § 40-35-115(b)(1)-(7) (2006). These factors include factor (4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about

24

committing a crime in which the risk to human life is high. T.C.A. § 40-35-115(b)(1)-(7). The trial court's finding that the Defendant is a "dangerous offender" by itself is insufficient to support consecutive sentences. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), our Supreme Court set forth additional requirements for consecutive sentences when the defendant is a "dangerous offender." Accordingly, in order to base consecutive sentencing on the dangerous offender category, the trial court must find: (1) that the term imposed "is necessary to protect the public from further criminal acts by the offender;" and (2) "that the terms imposed are reasonably related to the severity of the offenses committed." *Id*. at 938. The requirement of additional findings when the defendant is a "dangerous offender" "arises from the fact that of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The other categories for consecutive sentencing have "self-contained limits;" thus, the additional findings are limited to cases involving consecutive sentencing of "dangerous offenders." *Id*.

A trial court may base its sentencing determinations in general upon prior criminal behavior for which an accused has not yet been tried or convicted. *State v. Carico*, 968 S.W.2d 280, 287-88 (Tenn. 1998). Consequently, contrary to the Defendant's argument on appeal, a trial court may base its finding that a defendant is a dangerous offender upon conduct that is not yet the object of criminal proceedings. *State v. Horace Demon Pulliam*, No. M 2001-00417-CCA-R3-CD, 2002 WL 122928, *7 (Tenn. Crim. App., at Nashville, Jan. 23, 2002), *perm. app. denied* (Tenn. May 28, 2002). As long as the record establishes prior criminal conduct by a preponderance of the evidence, a trial court may base its finding that an accused is a dangerous offender on such conduct. *Id*.; *see* T.C.A. § 40-35-115(b)(4).

In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

At the conclusion of the sentencing hearing in Davis I, the trial court found that the Defendant's involvement in Michael Adams's death justified consecutive sentencing:

> [B]ased on the facts that I've heard . . . . [w]e now have Detective Fuqua talking about the other homicide where Mr. Adams was found in his home, shot with a gun that was also used in this case. The bullets matched. The car was missing, found burnt. We have the items that were found where Mr. Davis lived. And that is the medication as well as the martial arts. Again, the vehicle was burned, and in this particular case beyond recognition. The similarities as I determined previously–I found that it had been established by

25

clear and convincing evidence, but for the purposes of this Detective Fuqua–and this happens June the 5th, less than two months after the other victim was executed.

And I think based on all of that I'm going to find that he is a dangerous offender. And clearly I must go further and use the Wilkerson factors and determine whether the aggregate term necessarily relates to the severity of the offenses. Obviously two people were executed, and it's necessary to protect the public from further serious conduct by the [D]efendant. Obviously it's necessary when we have two serious situations as we have here well within a month. The first one–the events of this case happened first followed by another one where someone else is shot. At this point the record is not clear as to who did the shooting, but clearly the same gun was used. And the fruits of the crime were found–or some of the fruits of the crime were found with the defendant and, therefore, I'm going to run these sentences consecutive to each other.

Thus, the court found not only that the Defendant's prior criminal behavior established his status as a dangerous offender but also that the proximity of Adams's murder to that of Moreno-Gutierrez compelled the court to protect the public from "further serious conduct" by the Defendant and, by implication, that a life plus twenty-three years sentence necessarily related to the severity of Moreno-Gutierrez's murder.

At the sentencing hearing, Detective Fuqua described several aspects of Michael Adams's murder that indicated the Defendant committed both Adams's murder and that of Moreno-Gutierrez: the bullets fired into each victim's body were fired from the same .32 caliber gun; when the Defendant was arrested for Moreno-Gutierrez's murder, he was found to be in possession of several items stolen from Adams's apartment; the victims' killings were carried out similarly: each was shot execution style and robbed, and each victim's vehicle was stolen, burned out, and abandoned. The record, therefore, does not preponderate against the trial court's finding for sentencing purposes that the Defendant murdered Adams. *See* T.C.A. § 40-35-115(b)(4). Further, as is necessary to impose consecutive sentencing, the trial court explicitly found that the Defendant's resulting sentence reasonably related to his conduct and was necessary to protect the public from further criminal conduct. *See Wilkerson*, 905 S.W.2d 933. We conclude that the trial court properly found that consecutive sentencing factor (4) applied to the Defendant's crimes in Davis I and properly imposed consecutive sentencing on that basis. The Defendant is not entitled to relief on this issue.

### III. Conclusion

26

After a thorough review of the law and relevant authorities, we conclude that the evidence sufficiently supports the Defendant's convictions and that the trial court properly imposed consecutive sentencing.  As such, we affirm the trial court's judgments.


_____
ROBERT W. WEDEMEYER, JUDGE